ICE CREAM DRIVERS AND EM-PLOYEES UNION LOCAL 757, affiliated with the International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America, Plaintiff,

v.

BORDEN, INC., Defendant.

No. 69 Civ. 5002.

United States District Court, S. D. New York.

April 21, 1970.

Cohen & Weiss, New York City, for plaintiff; Samuel J. Cohen, Bruce H. Simon, Stanley M. Berman, New York City, of counsel.

Weil, Gotshal & Manges, New York City, for defendant; Robert Abelow, Marshall C. Berger, New York City, Carl A. Schwarz, Jr., New York City, of counsel.

## OPINION

COOPER, District Judge.

This is an action by plaintiff Ice Cream Drivers and Employees Union Local 757 (hereinafter "Union") to compel defendant Borden, Inc. (hereinafter "Borden") to arbitrate the issues of whether or not Borden's closing on October 3, 1969 of its Fifth Avenue Plant, and thereafter its alleged importation into the Metropolitan Area of ice cream manufactured outside of the Metropolitan Area, violated sections 2(e)[1] and 2(d)[2] respectively of the collectively-bargained Ice Cream Industry Area-Wide Agreement (hereinafter "Agreement") entered into by the parties on May 1, 1968 effective until April 30, 1971.

Plaintiff moves for summary judgment granting the relief requested pursuant to Rule 56 F.R.Civ.P. and for dismissal of defendant's counterclaim which seeks a declaratory judgment based on the premise that by reason of the Union's alleged illegal strike it has forfeited and waived its right to arbitration, or at least has no such right while the strike continues. Defendant resists these motions contending genuine issues of material facts are present.

The relevant facts viewed in the light most favorable to defendant follow. On August 25, 1969 representatives of the Union and Borden met to discuss the proposed closing of Borden's only manufacturing facility in the Local 757 Area, the Fifth Avenue Plant. As a consequence of the above-mentioned contractual restrictions, sections 2(d) and 2(e), Borden, in addition to terminating production, decided it must discontinue distribution in the 757 Area as well. The Union orally and by telegram dated September 2, 1969 notified Borden of its position that such proposed action would be violative of the contractual commitment " * * * to continue to manufacture within the area of Local 757."

Borden notified its employees covered by this 757 Area agreement that the last day of production would be on Friday,

---

1. § 2(e) provides in part:

"The Company agrees for the term of this Agreement not to remove its manufacturing operations from the area of Local 757 and to continue to manufacture within the area of Local 757, and the Company, including any affiliates or subsidiaries, agrees that it shall not establish or operate a plant for production of ice cream or frozen dessert products outside of the Local 757 area for sale or distribution of such products in the Metropolitan area * * *.

2. § 2(d) provides in part:

"The Company agrees not to contract out work customarily performed by its employees. * * *

* * * [T]he Company will not purchase or obtain products from any source including any other division or plant of the Company except from an employer in the Metropolitan Area as defined in this Agreement providing its employees with wages, hours and benefits and all other terms and conditions of employment equal to or better than the requirements of this Agreement. It is further agreed that the Company will not purchase or obtain products from any source whatever including any other division or plant of the Company if any permanent production employee who is actively employed on May 1, 1968 or thereafter is on layoff from the production department and has been on lay-off for a period of one (1) year or less at the time of the purchase of the product.

* * * * *

In the event of a substantial loss of business making it impossible for a company to comply with the limitations of section 2(d) with respect to the purchase of products while permanent production employees are on lay-off, the Union and the Company shall meet to discuss the matter and attempt to arrive at an adjustment by mutual agreement, but in the event of disagreement such matters shall not be subject to arbitration hereunder, except with the agreement of the Union."

October 3, 1969, and that the remaining inventory would be distributed until dissipated at which point Borden would go out of the ice cream business in their area. On October 1, 1969 Borden by telegram to the union demanded immediate arbitration of "the company's right to go out of business" stating that "it is necessary that this issue be finally resolved prior to our plant closing on October 3" and promising cooperation "to expedite the arbitration to resolve this issue within the time limits." The Union responded by telegram that day suggesting they meet to discuss issues which may be appropriate for arbitration and procedures therefor.

Such meetings between the parties were held on October 1, 2 and 3. Borden contends that at such negotiations the Union while professing willingness to arbitrate would not agree to expedited arbitration. On October 3, Borden closed the Fifth Avenue Plant. Immediately thereafter that same day the Union began picketing this plant and other Borden facilities. On October 6, the Union allegedly struck all Borden facilities throughout the 757 area and northern New Jersey; the strike and picketing still continue.

On October 13, 1969 the Union by letter to Borden requested arbitration as to whether the Company violated § 2(e) of the Contract by closing its plant. Borden replied by letter dated October 17 that it would proceed toward arbitration "as soon as the illegal work stoppage of 757, IBT ceases and the pickets are removed from our premises." On October 24, 1969 the Union wrote the Chairman of the New York State Mediations Board requesting arbitration as to whether the Company violated sections 2(d) and (e) of the Contract. Responding to this request, Borden wrote the Board on November 4, 1969 reiterating its position that no arbitration proceeding should be processed until the strike and picketing ceased, and that without prejudice to its position in that regard it was selecting three names from the list of arbitrators. The Mediation Board, in accordance with its procedures and after receiving the selections of both parties, designated Mr. Burton Turkus as Arbitrator. Borden refused to proceed. On November 13, 1969 this action was commenced by the Union.

The Agreement contains a broad, all-inclusive arbitration clause:

"8. Any and all disputes and controversies arising under or in connection with the terms or provisions of this Agreement, or in connection with or relating to the application or interpretation of any of the terms or provisions hereof, or in respect of anything not herein expressly provided but germane to the subject matter of this Agreement which the representative of the Union and the Company have been unable to adjust, shall be submitted to arbitration, at the request of either party * * *."

\* \* \* \* \* \*

The arbitration procedures herein contained shall be the exclusive remedy for the enforcement of this Agreement and for adjudication of any grievances arising hereunder, and such arbitration procedures may be instituted only by the Union or Employer."

The parties concede that the underlying dispute over whether Borden violated sections 2(d) and (e) is encompassed within their agreement to arbitrate and thus arbitrable. Cf. United Steelworkers of America v. Warrior & Gulf Nav. Co., 363 U.S. 574, 80 S.Ct. 1347, 4 L.Ed. 2d 1409 (1960).

Defendant seeks to avoid arbitration on the ground that plaintiff has waived its right thereto in that the Union has violated section 5(a) of the Agreement:

"No strikes, lockouts, walkouts or slowdowns shall be ordered, sanctioned or enforced by either party hereto against the other during the life of this Agreement."

Thus, the Union's alleged violation of the no-strike clause, combined with its earlier failure to accept Borden's proposal for expedited arbitration, is said to

waive the Union's right to invoke the procedure agreed upon by the parties as the exclusive remedy for resolving any and all of their disputes. We disagree.

■ First, we believe Borden's contention that the union is on strike in violation of the no-strike clause,[3] an initial premise of its waiver argument, must itself be resolved by an arbitrator and not by this Court. See G. F. Wright Steel & Wire Co. v. United Steelworkers, 346 F.2d 928 (1st Cir. 1965). See also, Drake Bakeries Inc. v. Local 50, American Bakery & Confectionery Workers Internat'l, 370 U.S. 254, 266, 82 S.Ct. 1346, 8 L.Ed.2d 474 (1962). This alone compels requiring arbitration here.

■ Second, we find the decision of the Supreme Court in Local Union No. 721, United Packinghouse Food & Allied Workers v. Needham Packing Co., 376 U.S. 247, 84 S.Ct. 773, 11 L.Ed.2d 680 (1964) controlling here. In Needham defendant therein argued, as Borden does here, that breach of the no-strike clause by the union constituted a waiver of its right to arbitrate. United Packinghouse Workers v. Needham, 376 U.S. at 249, 84 S.Ct. 773, reversing 254 Iowa 882 at 887, 119 N.W.2d 141 at 143.

Following discharge of an employee by Needham on May 11, 1961, 190 other employees and members of the Packinghouse Union left work that same day. Needham advised the employees to return to work stating that the discharge "would be treated under the grievance procedures of the collective bargaining agreement" and "that if they did not their employment would be regarded as terminated." 376 U.S. at 248, 84 S.Ct. at 774. They did not return. On July 5, 1961 (almost two months after the walk-out began) the union finally presented written grievances on behalf of the employee first discharged and the 190 later discharged. Needham refused to process the grievances.

The union sued to compel arbitration; the company asserted breach of the no-

strike clause by way of defense and counterclaim. A judgment on the pleadings in favor of Needham affirmed by the Iowa Supreme Court was reversed by the United States Supreme Court which held that Needham was governed by Drake Bakeries and that breach of the no-strike clause did not relieve the employer of its duty to arbitrate.

The Packinghouse Union was not held to have waived arbitration even though immediately following the walkout Needham offered to process the dispute by the grievance procedure if the employees returned and despite the fact that the employees did not return and the union did not file a grievance until almost two months later. A mere showing that "[one] party had engaged in action which could be contended to be in disregard of the obligation on its part to arbitrate" would not release the other party from its obligation to have the controversy finally determined by arbitration. Minnesota Joint Bd., Amal. Clothing Workers v. United Garment Mfg. Co., 338 F.2d 195, 199 (8th Cir. 1964).

"Such action would have to represent more than a mere ignoring of the obligation to arbitrate. It would have to constitute a repudiation of the obligation itself." Id. The Court in Minnesota Joint Board rejected any contention that the concepts of waiver or estoppel were applicable, and concluded that on the present state of the law following Drake Bakeries and Needham any excuse from the duty to arbitrate depended upon a showing of actual repudiation. Id. at 199 n. 1.

Borden concedes that the Union at no time expressly refused to arbitrate the issue of the plant closing. Here as in Needham and Drake Bakeries the bargaining agreement in no way expressly conditions the availability of arbitration upon no strike over the grievance. See International Union of Elec., Radio & Machine Workers v. General Electric Co., 332 F.2d 485, 492 (2d Cir. 1964);

3. The Union contends that there is no strike and that the plant closing constituted a lockout.

Trailways of New England, Inc. v. Amalgamated Assoc. etc., 343 F.2d 815, 817 (1st Cir. 1965). From the affidavits and exhibits submitted by both sides herein we believe it evident, and Borden does not contend to the contrary, that there was no actual repudiation by the union of the agreement to arbitrate.

Commentators have suggested that the Supreme Court may distinguish "a situation where the union breach is clear and substantial and the employer has given notice of termination of the entire labor agreement, and has acted consistently with such notice." Smith & Jones, "The Impact of the Emerging Federal Law of Grievance Arbitration on Judges, Arbitrators, and Parties," 52 U. Va.L.Rev. 831, 845–46 (1966). None of these factors are satisfied here.

Borden seeks to distinguish *Needham* on the ground the Supreme Court left open "whether a fundamental and long-lasting change in the relationship of the parties prior to the demand for arbitration would be a circumstance which, alone or among others, would release an employer from his promise to arbitrate." 376 U.S. at 253, 84 S.Ct. at 777. We assume arguendo that such a change might effect a release. But cf. Minnesota Joint Board v. United Garment Co., *supra*, 338 F.2d at 199 n. 1.

In this regard, it asserts first that such change is present here because the Union is still out on strike. In *Needham,* however, the Iowa Supreme Court in the course of upholding the lower court's refusal to compel arbitration stated:

"It is not seriously contended in this court that the 190 workers did not walk off the job and are still refusing to return thereto." 119 N.W.2d at 141.

Thus, this same factor was present in *Needham.* Further, to the extent Borden argues that arbitration should be stayed pending termination of the work-stoppage, it would appear that the effect to be given an alleged illegal strike which is still continuing is a matter for the arbitrator to determine. Cf. John Wiley & Sons, Inc. v. Livingston, 376 U.S. 543, 555–559, 84 S.Ct. 909, 11 L.Ed.2d 898 (1964).

Borden also asserts that its closing of the plant is "a fundamental and long-lasting change in the relationship of the parties prior to the demand for arbitration" releasing it from its duty to arbitrate. This contention likewise fails for the reason that (1) the closing occurred prior to and in fact precipitated the alleged breach of the no-strike clause and is the very dispute sought to be arbitrated here, and (2) only ten days elapsed between the plant closing and the union's request for arbitration.[4]

Finally, at least one Circuit has expressly held that the Supreme Court decisions in this area must not be given a restrictive reading of the sort pressed by defendant Borden. See Minnesota Joint Board v. United Garment Mfg. Co., 338 F.2d 195, 200 (8th Cir. 1964). See also, 52 U.Va.L.Rev. at 844; Katz, "Arbitration—Favored Child of Preemption," 17 N.Y.U.Conf.L. 27, 42–43 (1964).

Accordingly, for the reasons set forth above, plaintiff's motions for summary judgment in its favor compelling arbitration and for dismissal of defendant's counterclaim are granted.

Settle order on notice.

---

4. Lack of timeliness in requesting arbitration, if defendant asserts such by way of defense before us, is a matter not for the court but for the arbitrator to determine. See John Wiley & Sons, Inc. v. Livingston, *supra.*

We note also that it may be that the effect to be given the closing of the plant, like questions of timeliness in requesting arbitration, are matters to be decided by the arbitrator. See Local Lodge No. 595 of Dist. No. 152, Internat'l Ass'n of Machinists v. Howe Sound Co., 350 F.2d 508, 511 (3d Cir. 1965); Minnesota Joint Board v. United Garment Mfg. Co., *supra* at 200. We believe this would be so only where the closing was urged as affecting procedural issues and not the validity or applicability of an alleged obligation to arbitrate. See generally, John Wiley & Sons, Inc. v. Livingston, *supra.*