433 F.2d 41
 75 L.R.R.M. (BNA) 2481, 64 Lab.Cas. P 11,238
 ICE CREAM DRIVERS AND EMPLOYEES UNION LOCAL 757, affiliated
with the International Brotherhood of Teamsters,
Chauffeurs, Warehousemen and Helpers of
America, Plaintiff-Appellant-Appellee,
v.
BORDEN, INC., Defendant-Appellee-Appellant.
 Nos. 151-152, Dockets 35032, 35101.
 United States Court of Appeals, Second Circuit.
 Argued Sept. 15, 1970.
Decided Oct. 26, 1970.
 
 Robert Abelow, New York City (Weil, Gotshal & Manges, New York City and Carl A. Schwarz, Jr., New York City, of counsel), for defendant-appellee-appellant.
 Samuel J. Cohen, New York City Cohen & Weiss, New York City and Stanley M. Berman, New York City, of counsel), for plaintiff-appellant-appellee.
 Before WATERMAN, MOORE and KAUFMAN, Circuit Judges.
 MOORE, Circuit Judge:
 
 
 1
 This is an appeal by defendant Borden, Inc. (Borden) from an order of the District Court directing the parties to proceed to arbitration. Plaintiff Ice Cream Drivers and Employees Union Local 757, 312 F.Supp. 549 ('the Union') cross appeals from the portion of the order which defined the issue to be arbitrated.
 
 
 2
 Borden's appeal is based primarily upon its contentions that (1) there were issues of fact not to be resolved upon a motion for summary judgment and (2) that the Union's violation of a no-strike clause in its labor agreement precluded it from arbitration so long as the strike continued. The Union's appeal advances the claim that the District Court defined the issues to be arbitrated more broadly than the Union had requested. Resolution of these questions calls for a close analysis of the undisputed material facts.
 
 
 3
 The action was brought by the Union to compel arbitration between the Union and Borden (61 Stat. 156, 29 U.S.C. 185(a)). Borden asserted a counterclaim to the effect that the Union had lost or 'waived' its rights to arbitration because it had breached the no-strike clause of the Borden-Union labor agreement (the Agreement). The Agreement covered Borden's employees engaged in the production and distribution of ice cream in the '757 Area' (New York City, Nassau and Suffolk Counties).
 
 
 4
 The Union-Borden dispute arose out of a decision by Borden to close its Harlem ice cream manufacturing plant and to discontinue ice cream distribution in the New York metropolitan area. Notice thereof was given by Borden to the Union on August 25, 1969. The Agreement in substance provided that 'for the term of this Agreement' Borden would not 'remove its manufacturing operations from the area of Local 757' and would 'continue to manufacture' within this area-- Section 2(e). Section 2(d) related in part to obtaining products from outside sources including other divisions of Borden.[1]
 
 
 5
 Section 8 of the Agreement[2] contained a broad arbitration clause for the arbitration of 'Any and all disputes and controversies arising under * * * this Agreement, * * *.', which was to be 'the exclusive remedy for the enforcement of this Agreement * * *.' Section 5(a) of the Agreement also provided in an equally broad no strike clause that 'no strikes, lockouts, walkouts or slowdowns shall be ordered, sanctioned or enforced by either party hereto against the other during the life of this Agreement.'
 
 
 6
 Subsequent to August 25, 1969 negotiations between Borden and the Union ensued but were unsuccessful in reaching an acceptable solution. A telegram on September 2d from the Union to Borden advised Borden that any closing would be regarded as a violation of the Agreement and that the Union would seek 'REDRESS BY COURT PROCEEDINGS, BY ARBITRATION PROCEEDINGS * * *.' On October 1st Borden notified the Union by telegram that 'IT IS NECESSARY THAT THIS ISSUE BE FINALLY RESOLVED PRIOR TO OUR PLANT CLOSING ON OCTOBER 3d.', and stated its position that 'THE DISPUTE HINGES ON A SINGLE ISSUE 'THE COMPANY'S RIGHT TO GO OUT OF BUSINESS'.' The Union replied the same day that it was 'PREPARED Immediately to discuss/ WITH YOU ALL THE ISSUES WHICH MAY BE APPROPRIATE FOR ARBITRATION * * *' and suggested a conference arranged by the respective attorneys. Discussions on October 1st, 2d and 3d being to no avail, Borden by telegram offered to meet on October 6th 'FOR THE PURPOSE OF DEFINING THE ISSUES AND DESIGNATING AN ARBITRATOR.' Borden closed its Harlem plant on October 3d. That same day the Union began picketing. On October 6th the Union went on strike (the Union alleges a lockout) in the 757 and north New Jersey areas, which strike and picketing were in effect at least up to the time of the District Court's opinion.
 
 
 7
 As of October 13th, the Union's attorney wrote Borden, requesting arbitration of the issue:
 
 
 8
 'Has the Company violated Section 2(e) of the collective bargaining agreement by closing its Harlem plant; if so, what remedy or remedies is the Union entitled to?'
 
 
 9
 By letter of October 17th, Borden offered to exchange lists of arbitrators and 'to define an issue for arbitration.' This offer was conditioned upon the discontinuance of an asserted 'illegal work stoppage' and picketing.
 
 
 10
 As of October 24th the Union requested from the New York State Board of Mediation arbitration of the issue:
 
 
 11
 'Has the Company violated Sections 2(d) and 2(e) of the collective bargaining agreement; if so, what remedy or remedies is the Union entitled to?'
 
 
 12
 Borden (by letter, November 4th) advised the Mediation Board that until the illegal work stoppage and picketing ceased, 'no arbitration proceeding should be processed.' Borden added that it did not 'agree with the issues as stated by the union' but would 'define the proper issue(s) at the appropriate time.', and listed its preferences as to arbitrators.
 
 
 13
 On November 13th the Union brought this action, demanding judgment 'requiring defendant to arbitrate, pursuant to the contract, the above described dispute,' this was the dispute unilaterally asserted by the Union in its letter of October 24th to the Mediation Board, and granting such other and further relief as might be appropriate. Borden's answer, primarily its affirmative defense and counterclaim, in substance asserted its claim that, by striking, the Union had waived or forfeited its right to arbitration and that this forfeiture continued as long as the Union engaged in the strike and picketing.
 
 
 14
 The issues were raised before the District Court by plaintiff's motion for summary judgment. The Court granted the Union's motion, dismissed Borden's counterclaim and sent to arbitration 'the disputes between (Borden and the Union) arising out of Borden, Inc.'s closing of its manufacturing operations in the area, defined by the Collective Bargaining Agreement as the 757 Area.'
 
 
 15
 On appeal Borden argues (1) that there were genuine issues of material facts, thus precluding the granting of summary judgment in the Union's favor and (2) that by going out on strike the Union waived its right to arbitration. On this second point the Union and the Court below rely heavily on Local Union No. 721, United Packinghouse, Food and Allied Workers, AFL-CIO v. Needham Packing Co., 376 U.S. 247, 84 S.Ct. 773, 11 L.Ed.2d 680 (1964) in support of the no waiver argument. Borden, in turn, cites Boys Markets, Inc. v. Retail Clerk's Union, Local 770, 398 U.S. 235, 90 S.Ct. 1583, 26 L.Ed.2d 199 (1970) as indicating, by the overruling of Sinclair Refining Co. v. Atkinson, 370 U.S. 195, 82 S.Ct. 1328, 8 L.Ed.2d 440 (1962), that the right to arbitration has been forfeited by the strike.
 
 I.
 
 16
 Borden contends that before the rights of the parties under the Agreement can be ascertained, the court first must determine the nature of the work stoppage because 'if there was a waiver the Court could not order arbitration' (Borden Brief, p. 16). This flat statement is predicated upon the assumption that, on the state of facts now presented to this court, a finding of fact that the Union violated on October 3, 1969 its no-strike obligations of the Agreement would preclude any resort to the arbitrational process as defined in the Agreement.
 
 
 17
 The problem is not to be so simply resolved. The Congressional policy of encouraging arbitration as a means of settling labor disputes has been strongly supported by court decisions. See both the reasoning and the review of pertinent decisions in Boys Markets, Inc. v. Retail Clerks Union, supra. For this reason, a waiver of rights under an arbitration is not readily to be found. The decisions in Drake Bakeries v. Local 50, American Bakery & Confection Workers International, AFL-CIO, 370 U.S. 254, 82 S.Ct. 1346, 8 L.Ed.2d 474 (1962) and Local Union No. 721, United Packinghouse, Food and Allied Workers, AFL-CIO v. Needham Packing Co., 376 U.S. 247, 84 S.Ct. 773 (1964) expressly hold that arbitration rights are not necessarily forfeited by the breach of a no-strike clause.
 
 
 18
 In determining the effect of the alleged strike upon the right to arbitrate, the Court below did not have the benefit of Boys Markets, supra. That decision opened (or possibly reopened) the right of the employer to seek injunctive relief to protect its no-strike clause. But that is not this case. Borden quite understandably believed that it was living in the era of Sinclair and acted accordingly. As conceded, injunctive relief now would be of no avail.
 
 
 19
 The Court below held that Needham is 'controlling here.' Unless there is to be found any statement in Boys Markets to the contrary, the law as expounded in Drake Bakeries and in Needham is that breach of a no-strike clause in a labor agreement does not ipso facto relieve an employer of his obligation to arbitrate the disputes engendered by the acts causative of the strike. Although the Supreme Court specifically overruled Sinclair Refining Co. v. Atkinson, supra, which had held 'that the anti-injunction provisions of the Norris-LaGuardia Act[1] preclude a federal district court from enjoining a strike in breach of a no-strike obligation under a collective bargaining agreement, even though that agreement contains provisions, enforceable under 301(a) of the Labor Management Relations Act,[2] for binding arbitration of the grievance dispute concerning which the strike was called.', Boys Markets, supra, at 237-238 of 398 U.S., at 1585 of 90 S.Ct. neither majority nor minority opinion made any reference to Drake Bakeries or to Needham. Its decision was 'a narrow one' and affirmed an order of the district court granting injunctive relief hitherto seemingly barred by Sinclair. Thus we cannot read Boys Markets as overruling Drake Bakeries or Needham-- in fact, Boys Markets reaffirms the benefits intended to be conferred on the employer-employee relationship by resort to the arbitrational process.
 
 
 20
 This issue of law here is clearly revealed by the motion papers. Further investigation into the underlying facts is unnecessary to decide this question. The merits of Borden's action in closing the Harlem plant, the Union's action in engaging in picketing and in a strike, the Agreement obligations of Borden and the Union under the circumstances and the kindred issues related thereto are questions for the arbitrator.
 
 II.
 
 21
 As to the issues to be arbitrated, the District Court ordered the parties to proceed to arbitration of 'the disputes between Borden, Inc. and Ice Cream Drivers and Employees Union, Local 757, arising out of Borden, Inc.'s closing of its manufacturing operations in the area.'
 
 
 22
 The Union urges on its appeal that the Court should have restricted the arbitrator to the Union's proposed question: 'Has the Company violated Sections 2(d) and 2(e) of the collective bargaining agreement; if so, what remedy or remedies is the Union entitled to?' An answer 'yes' or 'no' to such a unilateral question would not have settled the parties' disputes. Arbitration is not a one-way street. The Union virtually concedes the nature of the dispute in saying: 'The dispute between the parties involves the employment, pension and other rights and benefits of hundreds of employees.' (App., p. 49a)-- in fact, it objected to 'the company's attempts to circumscribe and limit the arbitration procedure.'
 
 
 23
 The District Court was faced with a situation in which the parties had not agreed upon a specific question. The cause of the dispute is clear-- the closing of the Harlem plant. The Union claims that Borden's acts violated the Agreement and brought damage to its members. Borden claims that the strike was a violation of the Agreement and resulted in substantial damage to the company. The Court wisely concluded that there should be no narrowly restricted or piece-meal issues presented for arbitration but rather that 'the disputes' arising out of the plant closing should be heard and resolved. This judgment is in conformity with the Supreme Court's philosophy so clearly expressed in Boys Markets.
 
 
 24
 Judgment affirmed.
 
 
 25
 KAUFMAN, Circuit Judge (dissenting in part and concurring in part):
 
 
 26
 I endorse my brothers' view that Boys Markets, Inc. v. Retail Clerks Union, Local 770, 398 U.S. 235, 90 S.Ct. 1583, 26 L.Ed.2d 199 (1970), was designed to promote arbitral settlement of labor disputes. I therefore join in their refusal in Part I of their opinion to misuse Boys Markets by forbidding arbitration of this clearly arbitrable dispute. However, in Part II Boys Markets is made to revolve 180 degrees, a maneuver admirable for its suppleness if not for its consistency. I would not invite dalliance in future arbitrations by rewarding Borden's litigiousness when it should have been arbitrating.
 
 
 27
 No more than my colleagues do I favor 'piece-meal' dispositions. However, in broadening the submission to encompass disputes other than the one framed by the Union, the majority, I fear, has lost from view the severe limitations that the Supreme Court has imposed on our discretion in pre-arbitral litigation. Our power 'is confined to ascertaining whether the party seeking arbitration is making a claim which on its face is governed by the contract.' United Steelworkers of America v. American Manuf. Co., 363 U.S. 564, 568, 80 S.Ct. 1343, 1346, 4 L.Ed.2d 1403 (1960). Although Judge Cooper's submission seems innocuous enough-- even 'wise' as the majority characterizes it-- I am apprehensive that in overstepping the bounds marked out by such cases as American, today's decision invites difficulties that the Supreme Court has often and assiduously sought to avoid.
 
 
 28
 A common understanding of the parties as to the issues for settlement is hardly to be expected between adversaries in any judicial or quasi-judicial context. Borden could have availed itself of the opportunity to submit its own statment of the dispute, either before or after the Union's submission. It can do so now. If two divergent statements were to be submitted together, it is reasonable to believe that an experienced arbitrator would not be at a loss to hear the respective positions presented and to merge them as justice, common sense, and his own training might suggest.
 
 
 29
 Nor can I imagine that the union's statement of the issue would paralyze the arbitrator from taking account of all the facts relevant to a just decision. If today's reformulation requires him to decide issues other than those pertinent to the dispute identified by Borden's submission, then the majority is compelling arbitration that no party has properly requested. And we have been instructed that 'a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit.' United Steelworkers of American v. Warrior & Gulf Navigation Co., 363 U.S. 574, 582, 80 S.Ct. 1347, 1355; 4 L.Ed.2d 1409 (1960).
 
 
 30
 By ignoring this mandate, the majority not only short-circuits the contractual arbitration machinery, but condones the court's interjection into the merits of the controversy between Borden and the union. The 'cause' of this controversy may be as 'clear' as the majority finds it or it may be muddy, but we have been warned that such 'procedural' questions as the proper scope of the pleadings 'which grow out of the dispute and bear on its final disposition should be left to the arbitrator.' John Wiley & Sons v. Livingston, 376 U.S. 543, 557, 84 S.Ct. 909, 918, 11 L.Ed.2d 898 (1964). He is better qualified than we by expertise and attitude to understand the ramifications of any redefinition of the issues in the context of 'the general body of the law of the enterprise.' H. Wellington, Labor and the Legal Process 105 (1968).
 
 
 31
 More disturbing to me about today's ruling are 'the opportunities for deliberate delay' inherent in offering a haven in this court for disputants casting about for ways to delay or avoid their obligation defined by contract to go to arbitration. Both parties voluntarily chose not to lay in the path of quick disposition such obstacles as a requirement that they be in perfect agreement on the statement of issues to be arbitrated. 'In order to expedite arbitration' the collective bargaining contract before us allows only 96 hours for the selection of an arbitrator. In short, the experienced counsel of both parties sought to make the contract's arbitration provision expeditious and meaningful and to avoid the delaying procedures encountered in a case such as Socony Vacuum Tanker Men's Ass'n v. Socony Mobil Oil Co., 369 F.2d 480 (2 Cir., 1966).[1] We should not permit either party to frustrate the other's desire to put this admirably expeditious procedure to its intended use simply by insisting on a counter-statement of the other's submission and requiring that the court frame the issue. When the sole question presented to the judge is the contractual interpretation of the arbitration clause and not what should be arbitrated, the courts are better advised to stay out of the thicket of framing issues and to leave that to the experienced arbitrator.
 
 
 
 [1]
 Sections 2(d) and 2(e) of the Agreement provide:
 '(d) The Company agrees not to contract out work customarily performed by its employees. However, nothing herein contained shall prevent the Company from continuing to have work performed outside of the Company which prior to April 30, 1962 it customarily has had performed outside the Company. Supervisory employees shall not perform the duties of employees covered by this agreement.
 'In order to protect the job opportunities and labor standards of all employees in the industry-wide collective bargaining unit and at the same time provide for greater flexibility of the companies covered by this Agreement, the Company will not purchase or obtain products from any source including any other division or plant of the Company except from an employer in the Metropolitan Area as defined in this Agreement providing its employees with wages, hours and benefits and all other terms and conditions of employment equal to or better than the requirements of this Agreement. It is further agreed that the Company will not purchase or obtain products from any source whatever including any other division or plant of the Company if any permanent production employee who is actively employed on May 1, 1968 or thereafter is on lay-off from the production department and has been on lay-off for a period of one (1) year or less at the time of the purchase of the product.
 '(e) The company agrees for the term of this Agreement not to remove its manufacturing operations from the area of Local 757 and to continue to manufacture within the area of Local 757 and the Company including any affiliates or subsidiaries, agrees that it shall not establish or operate a plant for production of ice cream or frozen dessert products outside of the Local 757 area for sale or distribution of such products in the Metropolitan Area; however nothing herein shall restrict a company which formerly manufactured under contract with Local 757 or 680 from resuming such manufacturing under contract with said Local for distribution in its area.
 'The area of Local 757 shall be New York City and Nassau and Suffolk Counties in the State of New York.'
 
 
 [2]
 Section 8 of the Agreement provides:
 'Any and all disputes and controversies arising under or in connection with the terms or provisions of this Agreement, or in connection with or relating to the application or interpretation of any of the terms or provisions hereof, or in respect to anything not herein expressly provided but germane to the subject matter of this Agreement which the representative of the Union and the Company have been unable to adjust, shall be submitted to arbitration at the request of either party, to an Arbitrator selected from a list of Arbitrators to be furnished by the New York State Board of Mediation in each case. If no Arbitrator on such list is mutually acceptable to the parties, the Arbitrator shall be designated by the New York State Board of Mediation. The decision of the Arbitrator so selected or designated shall be final and binding upon the parties. The fees and expenses of the Arbitrator in such cases shall be borne equally by the parties. In order to expedite arbitration proceedings the New York State Board of Mediation shall submit a list of Arbitrators to the parties within 48 hours after request by either party and both parties shall be required to make their selection within 48 hours after recepit of such list. If either party shall fail to make a selection within such time the Board shall be authorized to designate an Arbitrator from such list immediately.
 'The arbitration procedures herein contained shall be the exclusive remedy for the enforcement of this Agreement and for adjudication of any grievances arising hereunder, and such arbitration procedures may be instituted only by the Union or the Employer.'
 
 
 [1]
 By contrast, in Socony I joined in rejecting the company's contention that it could effectively emasculate the contractual arbitration procedure simply by refusing to agree to a common definition of the dispute. In that case, where the collective bargaining contract explicitly required that the parties agree on a submission, the only reasonable solution was for this court to undertake to define the issues