**ROOFING AND SHEET METAL CONTRACTORS' ASSOCIATION OF PHILADELPHIA AND VICINITY et al.**

v.

**SHEET METAL WORKERS' INTERNATIONAL ASSOCIATION, LOCAL UNION NO. 19.**

Civ. A. No. 75–622.

United States District Court,
E. D. Pennsylvania.

May 2, 1975.

Steven R. Waxman, Philadelphia, Pa., for plaintiffs.

Bernard N. Katz, Philadelphia, Pa., for defendant.

## OPINION

DITTER, District Judge.

In this case, a preliminary injunction was granted to prohibit defendant's breaching the no strike provision in a collective bargaining agreement. Defendant has appealed. This opinion is being prepared so the Court of Appeals may be advised of my reasons for issuing the injunction.

Plaintiff, Roofing and Sheet Metal Contractors' Association of Philadelphia and Vicinity (RSMCA), is a Pennsylvania corporation, the primary function of which is to represent its members in negotiating and administering collective bargaining agreements with various labor unions. Plaintiffs, Kulzer Roofing, Inc., and Scanlon & Hays Company, Inc., members of RSMCA, are corporations engaged in the roofing and sheet metal contracting business. All three plain-tiffs are employers within the meaning of Section 2(2) of the Labor Management Relations Act, 29 U.S.C. § 152(2).

Defendant, Local 19, Sheet Metal Workers International Association, is a labor organization within the meaning of Section 2(5) of the Labor Management Relations Act, 29 U.S.C. § 152(5). Local 19 is organized for purposes of representing its members concerning wages, working conditions, and grievances with employers in the Philadelphia vicinity.

RSMCA and through it, Kulzer and Scanlon, are parties to a collective bargaining agreement with Local 19, effective until April 30, 1975. Kulzer and Scanlon, which both employ members of the defendant, Local 19, are engaged as subcontractors performing construction work at Neshaminy Maple Point High School in Middletown Township, Bucks County, Pennsylvania. Under state law, 53 P.S. § 1003 and 71 P.S. § 1618, specifications for projects of this type must be drawn so that there can be separate bids on plumbing, heating, ventilating, and electrical work. The contract is then awarded to the lowest responsible bidder.

Another subcontractor at the Neshaminy High School construction site is Sherrard Electrical, Inc., which does not employ union labor. There are two gates or entrances to the project, one reserved exclusively for Sherrard employees, the other is for use by all other individuals, including employees of Kulzer and Scanlon.

Around the first of this year, several of Sherrard's employees selected Local 98, International Brotherhood of Electrical Workers, as their bargaining agent. Sherrard, however, did not execute a collective bargaining agreement with Local 98. Beginning on or about January 16, 1975, Local 98 picketed the Sherrard entrance at the Neshaminy construction site. Thereafter, certain members of Local 19, who formerly worked for Kulzer and Scanlon, withheld their labor and refused to perform their duties of em-

ployment. Kulzer and Scanlon have no connection with Sherrard except that they are all contractors working on the same site, and there is no dispute between Local 98 and Kulzer and Scanlon.

Two parts of the collective bargaining agreement between plaintiffs and defendant are important here. Article 12 provides a four-step arbitration culminating in an appeal, by either party, to the National Joint Adjustment Board established by the Sheet Metal Contractors National Association and the International Union. A decision by the board is binding on both parties. Section 5 of Article 12, however, stipulates that:

> There shall be no cessation of work by strike or lockout during the pendency of the procedures provided for in this Article.

The other relevant provision, Article 13, states that the collective bargaining agreement is not violated if members of Local 19 refuse to cross or work behind any "legal" picket line.

Under the agreement, when an employer needs workers he contacts the union hiring hall which then sends its members in order of longest without work to the job site. The employer does have the option to reject those offered until those with particular qualifications are sent. Between January 16, 1975, and the hearing in this matter, March 5, 1975, Local 19 dispatched approximately ten persons to Kulzer and Scanlon at the Neshaminy construction site but in each case the men declined to work. At the time, Local 19 had approximately 2000 members of which well over 300 did not have jobs.

Kulzer and Scanlon claimed they would suffer irreparable harm if an injunction was not granted to force compliance with the agreement's no strike provisions. At the time, construction on the roof of the school had been completed. However, the expansion joints, wall copings and roof edges which were to be covered with sheet metal had not been finished. Thus, if it snowed or rained,

moisture could get in and destroy much of the interior ceiling and electrical work as well as the roof itself. Moreover, other mechanics had to reschedule their jobs since most of the interior sheet metal work for the heating and air conditioning system was still to be done.

As a result, Kulzer and Scanlon were directed in a letter from the prime contractor, Frank H. Wilson Company, to begin to perform their contracts by February 24, 1975. If Wilson had sent another such notice to plaintiffs as to their lack of performance, they would have been subject to removal from the project within 48 hours. As one of their contract requirements, both Kulzer and Scanlon obtained performance bonds. If they were to default on their work and the bonding company had to pay damages, Kulzer and Scanlon might be unable to get further bonds and perhaps be unable to bid on future construction jobs.

Plaintiffs contended that in view of the no strike provision in the parties' collective bargaining agreement, the refusal by Local 19's members to cross Local 98's picket line justified the issuance of an injunction under the holding in *Boys Markets, Inc., v. Retail Clerk's Union, Local 770*, 398 U.S. 235, 90 S.Ct. 1583, 26 L.Ed.2d 199 (1970).

Defendant replied that while an injunction might be issued if there was a strike, there was not a strike here—and certainly none directed at either Kulzer or Scanlon. It is Local 19's position that its members have a right to withhold their services from Kulzer and Scanlon because Article 13 of the contract with RSMCA does not require the workers to cross a "legal" picket line and Local 98's picket line was lawful.

Plaintiffs responded that while Local 98's picket line might have been legal as to Sherrard, it was not "legal" as to Kulzer and Scanlon as that term is used in Article 13 of the collective bargaining agreement. Accordingly, plaintiffs contended that the withholding of their

services by employees of Kulzer and Scanlon amounted to a secondary boycott.

Based upon the evidence I heard and the stipulations of counsel, I concluded that:

(1) there was a valid collective bargaining agreement between the parties requiring mandatory arbitration for all disputes [1] and containing a no strike clause;

(2) there was a dispute between the parties over an arbitrable issue, specifically as to whether Local 98 had established a "legal" picket line which justified Local 19's members refusal to cross it by reason of Article 13;

(3) Local 19 had not taken any steps to prevent or bring an end to the withholding of work by the individual members of the union; and

(4) if Local 19's members continued to withhold their labor from Kulzer and Scanlon, the appeals procedures [2] provided in the collective bargaining agreement would not afford these employers adequate relief and they would suffer irreparable harm.

It is well established that a union is responsible for what its members do. Where a collective bargaining agreement contains a no strike provision, a union must take whatever reasonable measures are available to prevent or bring to an end its members' activities in which it as an entity could not engage. *Wagner Electric Corporation v. Local 1104, International Union of Electrical, Radio and Machine Workers*, 496 F.2d 954, 956–57 (8th Cir. 1974); *Eazor Express, Inc., v. International Brotherhood of Teamsters, Local 249*, 357 F.Supp. 158, 163–64 (W.D.Pa. 1973). In this case there was no evidence that Local 19 had taken any action at all—much less all reasonable mea-

sures. Although ten members of the 300 who were without jobs had been sent to Kulzer and Scanlon by the hiring hall over a period of more than six weeks, Local 19 did nothing else to end the withholding of work from plaintiffs.

Defendant's argument that the decisions of *Johnson Builders, Inc. v. Carpenters and Joiners, Local 1095*, 422 F.2d 137 (10th Cir. 1970) and *Ice Cream Drivers, Local 757 v. Borden, Inc.*, 312 F.Supp. 549 (S.D.N.Y.1970), based upon *Drake Bakeries Inc. v. Local 50, American Bakery and Confectionary Workers*, 370 U.S. 254, 82 S.Ct. 1346, 8 L.Ed.2d 474 (1962), mandate that this court cannot issue an injunction in this type of case is inapposite. Both *Johnson* and *Ice Cream Drivers* were issued just a few months before the Supreme Court's decision in *Boys Markets* and therefore are not relevant or controlling.

In issuing the injunction, I followed the recent Third Circuit en banc decision of *NAPA Pittsburgh, Inc. v. Automotive Chauffeurs, Local 926*, 502 F.2d 321 (3d Cir. 1974). In that case, the plaintiff had two plants, one in Pittsburgh and one in Altoona, each represented by different unions. The union at the Altoona facility struck NAPA and decided to picket the Pittsburgh building. Thereafter, though having no dispute with management, the Pittsburgh union members refused to cross the Altoona union's picket line.

The Pittsburgh union claimed the picket line involved a "primary" labor dispute and therefore under the parties' collective bargaining agreement, it was legal to refuse to cross it. NAPA, on the other hand, said that it was a secondary labor dispute and the walkout was illegal. In affirming the issuance of an injunction by the lower court, the Circuit stated that the dispute over the

---

1. Article 12, Section 1 provides: "Grievances of the Employer or the Union, arising out of interpretation or enforcement of this Agreement, *shall* be settled [by the following procedures]."

2. Plaintiffs each initiated the first step of the grievance procedure. However, even if steps two and three could have been quickly taken, a final hearing before the National Joint Adjustment Board could not have been arranged until June.

meaning of the word "primary" was arbitrable and sufficient to bring the case within the *Boys Markets* exception.

Similarly, whether Local 19 members can refuse to work at a site where another union is legally picketing a separate entrance is an arbitrable dispute under the contract within the meaning of *Boys Markets*. When an arbitrable dispute exists, there is a strong public policy in favor of settling the controversy by arbitration and not economic force. Based on *Boys Markets* and *NAPA* I concluded the union should have availed itself of the grievance machinery and should not have withheld its labor at the Neshaminy construction site. Thus, I issued the requested injunction.